

**IT IS ORDERED as set forth below:**

**Date: March 27, 2020**

_____
**Lisa Ritchey Craig**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | : | CASE NUMBER |
| | : | |
| HENRY C. HARDIN, III, | : | 18-70395-LRC |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |
| AMERICAN ZURICH INSURANCE | : | |
| COMPANY, ZURICH AMERICAN | : | |
| INSURANCE COMPANY, THE ZURICH | : | |
| SERVICES CORPORATION, | : | |
| | : | |
| Movants, | : | |
| | : | |
| v. | : | |
| | : | |
| HENRY C. HARDIN, III, | : | IN PROCEEDINGS UNDER |
| | : | CHAPTER 7 OF THE |
| Respondent. | : | BANKRUPTCY CODE |

## <u>ORDER</u>

Before the Court is the *Motion to Dismiss Pursuant to 11 U.S.C. § 707(a)* (Doc. 37)

(the "Motion"), filed by American Zurich Insurance Company ("AZIC"), Zurich American Insurance Company ("ZAIC"), and The Zurich Services Corporation ("ZSC", and, collectively with AZIC and ZAIC, "Zurich").   The Motion is opposed by Henry C. Hardin, III ("Debtor") (Doc. 56), Cathy L. Scarver ("Trustee") (Doc. 53), creditors Cohesive Networks, Inc. and Cohesive Networks 2, Inc. ("Cohesive") (Doc. 52), creditor AWP Holding Company, Inc. ("AWP") (Doc. 54), and creditors Continental Casualty Company, American Casualty Company of Reading, Pennsylvania, Transportation Insurance Company, National Fire Insurance Company of Hartford, and CNA ClaimPlus, Inc. (the "Insurers" and, collectively with Cohesive and AWP, the "Creditors") (Doc. 55). Additionally, at an earlier hearing held on the Motion, counsel for the United States Trustee apprised the Court of the United States Trustee's objection to the Motion and her support for the continuation of the case.

The Court conducted an evidentiary hearing in this matter from October 15, 2019, through October 18, 2019 (the "Evidentiary Hearing"). The Court has subject matter jurisdiction over this core proceeding.   28 U.S.C. § 1334(b); § 157(b)(2)(A), (O).

I. <u>Introduction</u>

The issue in this contested matter is whether "cause" exists to dismiss Debtor's bankruptcy case pursuant to 11 U.S.C. § 707(a).   Zurich holds one of the largest claims filed against Debtor and asserts that Debtor filed this Chapter 7 bankruptcy case solely to

thwart its efforts to collect a judgment they obtained against Debtor in a breach of contract action arising out of Debtor's former business.   Zurich asserts that Debtor's prepetition conduct, which included multiple transfers of property to his wife and excessive spending, constitutes bad faith, which is grounds for dismissal under § 707(a).   Although Debtor concedes that prepetition bad faith can be cause for dismissal under § 707(a), he argues that his conduct does not warrant dismissal of this case.   The Trustee, the Creditors, and the United States Trustee oppose dismissal because assets are available for liquidation and will provide a distribution that will benefit all creditors, whereas dismissal of the case would benefit only Zurich.

Having considered the Motion, Debtor's response, the objections filed by the Trustee and the Creditors, the relevant law, and the evidence presented during the Evidentiary Hearing, and for the reasons explained below, the Court will exercise its discretion to deny the Motion.   This Order will constitute the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as made applicable to this contested matter by Bankruptcy Rule 9014(c).[1]

II. Facts

Debtor has been married to Linda Hardin for thirty-two years, and they have four

---

[1] To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such. Alternatively, to the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

children.[2]  Linda Hardin, Oct. 16, 2019.   Neither Debtor nor Linda had any significant cash or savings at the time they met and married, and Linda has not inherited money or property or received gifts from anyone other than Debtor.   *Id*.   In the beginning, the couple lived on Linda's salary for several years, while Debtor focused on building a series of businesses.   *Id*.; Debtor, Oct. 17, 2019.   Throughout most of the marriage, Linda has primarily been a housewife.    However, she has worked outside the home and has invested her income and funds received from Debtor in various business interests, including a fitness gym, in which she worked seven days a week, but which failed and is now defunct, and SCI India, a payroll operations company she owned jointly with Debtor, but is no longer operational.   Debtor, Oct. 17, 2019; Linda Hardin, Oct. 16, 2019; Exhibit D64.   For ten years, Linda also owned jointly with Debtor three rental properties, and, since 2017, she has owned a 20% interest in a restorative health business.   Debtor, Oct. 15, 2019; Linda Hardin, Oct. 16, 2019.   She also assisted Debtor while he was building his businesses by working on billing and processing payrolls.   Debtor, Oct. 17, 2019.   Debtor, however, was clearly the main income earner in the marriage, generating approximately $20 million in income over his working career.   Debtor, Oct. 15, 2019; Robert Taylor, Oct. 16, 2019.

Debtor and Linda have lived in a 7,000 square foot, five-bedroom, three and a half-bath home in Dacula, Georgia for approximately twenty-two years (the "Home").

---

[2]  The Court will cite to the testimony of witnesses called to testify during the course of the evidentiary hearing by referencing the witness' name and the day of the hearing upon which the testimony was given.

Debtor, Oct. 15, 2019.  The Home has many atypical amenities, including custom iron doors, beautiful architectural details, a gourmet chef's kitchen, a master suite with soaring cathedral ceilings, a sitting area overlooking the Hamilton Mill golf course, a custom walk-in closet, an entertainment venue with a theater and a stage above the garage, and an outdoor terrace.  *Id*.  The Home was purchased in 1998 for approximately $600,000.  *Id*. Linda intended and believed that she would be a joint owner of the Home from day one, and Debtor believed that the Home was jointly titled when purchased.  Linda Hardin, Oct. 16. 2019; Debtor, Oct. 17, 2019.  In 2008, when Debtor and Linda purchased a "sliver" of land adjacent to the Home with funds from their joint account, they took title jointly.  Linda Hardin, Oct. 16, 2019; *see also* Exhibit Z24; D79.  Eventually Debtor and Linda realized that, other than the "sliver," the Home was held in Debtor's name only.  Linda Hardin, Oct. 16, 2019; Debtor, Oct. 15, 2019.

Debtor and Linda also owned a 52-acre farm with a main house, guest house, storage facility, and garage in Commerce, Georgia (the "Farmhouse").  Debtor, Oct. 15, 2019; Linda Hardin, Oct. 16, 2019.  Debtor purchased the Farmhouse in October 2003 for $500,000 and transferred a one-half interest to Linda immediately.  Debtor, Oct. 15, 2019, Oct. 17, 2019; Exhibits D67, D68.

From 1985 through 2013, Debtor was in the business of operating "professional employment organizations" ("PEOs"), which were staffing companies that outsourced

5

payroll, worker's comp, and benefits, and some training.   Debtor, Oct. 17, 2019.   Debtor owned the majority of the business, organized in various entities, and the business generated a significant amount of revenue.   *Id.*

A PEO provides human resources, payroll, benefits and workers compensation insurance to its clients in order to obtain the costs savings and benefits available to a larger employer.   *Id.*   Debtor operated and owned multiple PEOs in different jurisdictions. Debtor also owned Professional Management Services Group ("PMSG"), which served as a shared management company for Debtor's various PEO entities from 2005 through 2013. *Id.*   PMSG collected client fees from the different PEOs based on gross sales or payroll or, later, based on the number of employees and deposited the fees into pooled accounts, such as operating and payroll, and the PEOs shared PMSG's overhead expenses and other costs, such as the cost of a chief financial officer.   *Id.*   PMSG also managed PEOs owned by Debtor's brother, John Hardin.   *Id.*

In 2005, Debtor began considering whether he could get out of the PEO business, as he wanted to do something with more purpose.   *Id.*   He consulted an estate planner at that time, who raised concerns about the Debtor's lack of liquidity and the large amount of estate tax that would be due if Debtor died.   *Id.*

In 2010, Debtor began the process of retiring so that he could focus on coaching soccer.   Linda Hardin, Oct. 16, 2019; Debtor, Oct. 17, 2019.   To do so, Debtor sold his

business to John Hardin in two transactions in 2010 and 2014.  Debtor, Oct. 17, 2019.

Following the final sale, Debtor was no longer involved with the day-to-day operations of

the PEOs and focused on his other businesses, Risk Management Underwriters ("RMU"),

SCI India, and Platform One.  *Id*.

Around 2010, Debtor also met with an attorney and an accountant, who advised

Debtor to divide up his assets to take advantage of the spousal exclusion.  *Id*.

Subsequently, in August 2011, Debtor gave most of his liquid assets, such as cash and his

stock portfolio, to Linda.  Linda Hardin, Oct. 16, 2019; Debtor, Oct. 17, 2019.  Debtor

retained his more non-liquid businesses, including the PEOS and two office buildings,

which, at the time were estimated to be worth more than $20 million.  *Id*. In December

2011, Debtor transferred his interest in the Farmhouse, which was no longer subject to any

encumbrance, to Linda as a gift.  Debtor, Oct. 15, 2019, Oct. 17, 2019; Exhibit Z5; Linda

Hardin, Oct. 16, 2019.

Since approximately 2016, Linda has rented the Farmhouse out to groups and for

events, such as weddings.  Debtor, Oct. 15, 2019; Linda Hardin, Oct. 16, 2019.  Linda

markets the Farmhouse on websites, such as Air BNB and VRBO, manages all of the

bookings, and maintains the property.  Linda Hardin, Oct. 16, 2019; Exhibit Z3.  Rental

income from the Farmhouse in 2018 totaled $100,965 and $102,500 in 2017.  Linda

Hardin, Oct. 16, 2019.  Following this asset division, Debtor invested in several

unsuccessful business ventures, including the Silverbacks soccer team and a fitness business.   Linda Hardin, Oct. 16, 2019; Debtor, Oct. 17, 2019.   Debtor also spent significant amounts of money on legal fees.   Debtor, Oct. 17, 2019.

Zurich was one of the worker's compensation providers for the PEO's from 2003-2012.  *Id.*   The policies were "loss sensitive insurance contracts" with large deductibles and were retrospective in nature.   Debtor, Oct. 17, 2019, Oct. 18, 2019.  Specifically, the contract permitted Zurich to bill for premiums and fees based on its estimates and loss forecasts for the policy period, but to adjust the amounts due at various times for actual claims and losses from prior policy periods.   Debtor, Oct 17, 2019.   In 2011, Zurich issued an invoice to the PEOs with a loss valuation date through November 2011, stating that $6,901,011 would be due in December 2011 (the "2011 Invoice"), which includes such a retrospective adjustment for the 2011 policy year.   Exhibit Z149; Exhibit D8; Bo Gursky, Oct. 15, 2019; Debtor, Oct. 17, 2019.

Debtor received and reviewed the 2011 Invoice in connection with discussions at the end of 2011 with a risk management team tasked with determining whether to renew the policies with Zurich in March 2012, but Debtor was no longer involved in the day-to-day operations.   Debtor, Oct. 17, 2019.   The proposal for renewal would have resulted in a 15% increase in the cost, and the total management team decided not to renew the policy over Debtor's objection.   *Id.*

8

In January 2012, Zurich issued an invoice to the PEOs for $4 million and issued a demand letter for payment.   Bo Gursky, Oct. 15, 2019.   In October 2012, Zurich and the PEOs entered a payment and standstill agreement (the "Standstill Agreement") following meetings with Debtor.   *Id*.; Debtor, Oct. 17, 2019; Exhibit Z88.   The Standstill Agreement provided for additional amounts of money to be paid into the collateral trust, but it expired in April 2013.   Bo Gursky, Oct. 15, 2019.   The $4,694,735 plus interest was paid.   Debtor, Oct. 17, 2019.   In October 2012, Debtor believed that the Standstill Agreement would "standstill" the litigation and that the parties could work it out and try to renew the policies for the next year.   *Id*.   Following the expiration of the Standstill Agreement, the parties met again, but the negotiations failed to resolve the parties' issues, and no further payments were made.   Bo Gursky, Oct. 15, 2019.   Debtor was surprised by the amount of the adjustments owed to Zurich, as in previous years, most of the adjustments had "netted out."   Debtor, Oct. 18, 2019.

On May 2, 2013, Zurich made its first arbitration demand for approximately $1 million, Debtor, Oct. 17, 2019, which it amended at the end of 2014 to demand $16 million, *Id*.; Bo Gursky, Oct. 15, 2019, Oct. 18, 2019; Exhibit D81.   Zurich filed legal action in May 2013, Bo Gursky, Oct. 15, 2019, beginning litigation that would eventually cause Debtor and his companies to spend approximately $1.4 million defending against Zurich's claims, Debtor, Oct. 17, 2019.   Following a five-day hearing, the arbitrator awarded

9

Zurich $16 million, for which Zurich filed for judgment to be entered against SCI, PMSG, and Leasing Resources of America, Inc.   Bo Gursky, Oct. 15, 2019; Exhibits Z47; Z48; D82.   Debtor did not attend the trial.   Debtor, Oct. 17, 2019.   At that time, no claims had been made by Zurich against Debtor personally, but Debtor knew he "could have exposure."   *Id*.

Zurich also filed a complaint in Florida to recover service fees that were outstanding in the amount of $590,000 and obtained a judgment in the amount of $590,539, plus later awards for attorney's fees and costs of $45,000 and $76,000.   Bo Gursky, Oct. 15, 2019; *see also* Exhibit Z152.   The PEOs did not voluntarily pay the judgment.   *Id*.

In May 2015, Zurich filed a complaint in the United States District Court for the Northern District of Florida, seeking to avoid a transfer of $150,000 made by Executive to Debtor on April 23, 2014.   *Id.;* Exhibits Z150; Z151.   Debtor settled this lawsuit with Zurich and made a partial payment on this portion of his liability to Zurich.   Bo Gursky, Oct. 15, 2019.

On February 20, 2016, Continental Casualty Company and various affiliates ("CNA Plaintiffs") filed a lawsuit against Debtor, and that litigation remained pending on the Petition Date.   Debtor, Oct. 17, 2019; Exhibit D88.   Additionally, AWP Holding Company, Inc. ("AWP") filed a lawsuit against Debtor.   Debtor, Oct. 17, 2019.

On April 18, 2014, in Case No. 13-01896, the United States District Court for the

Middle District of Florida (the "FLMD") entered judgment in favor of ZSC and against Professional Management Services Group, Inc. ("PMSG").  Stipulations of Fact 9 (Doc. 158) ("SF 9"), ¶ 1.  Such judgment was subsequently increased by the FLMD to include attorney's fees and costs.  SF 9, ¶ 1.  On May 4, 2015, ZSC filed a supplemental complaint against Staffing Concepts National, Inc. ("SCN"), Executive Management Group, Inc. ("EMG"), and PMSG.  SF 9, ¶ 2.  On November 15, 2016, the FLMD entered judgment on the supplemental complaint, and on December 22, 2016, further awarded Zurich attorney's fees and costs. SF 9, ¶ 3.

On September 25, 2014, in Case No. 14-03093, ZSC filed a complaint against Debtor, Fitness Consulting Group, LLC ("FCG"), and PMSG in the United States District Court for the Northern District of Georgia (the "GAND").    SF 9, ¶ 4.

On May 7, 2015, in Case No. 14-03454, arbitrators entered a final award in favor of ZAIC and AZIC against PMSG.  SF 9, ¶ 5.  On July 23, 2015, the United States District Court for the Northern District of Illinois reduced the final award to a judgment against PMSG. SF 9, ¶ 6.

From mid-2016 through early January 2017, Debtor signed checks drawn on the Joint Account in the approximate amount of $83,000 to fund Linda's purchase of an interest in a limited liability company that owns several medical clinics ("Restorative Health").  Debtor, Oct. 15, 2019; Exhibit Z21.  Debtor served as the organizer and

11

registered agent of Restorative Health, but now has no involvement with the business, and only Linda has an ownership interest in Restorative Health.  Debtor, Oct. 15, 2019; Exhibit Z20.  Linda decided to invest in Restorative Health because she was interested in hormone replacement therapy and other treatments for longevity.  Linda Hardin, Oct. 16, 2019.

In the summer of 2017, Linda closed on the purchase of a 4,000 square-foot, four-bedroom home with a two-car garage and a boat dock on Lake Lanier (the "Lake House") for around $800,000.  Debtor, Oct. 15, 2019.  Prior to that time, Linda had signed a purchase agreement with the sellers, Steve Lester and his wife.  Linda purchased the Lake House with the idea of moving from the Home to the Lake House, but soon determined that the Lake House was too far away from her children and new grandchild. Linda Hardin, Oct. 16, 2019.  At Linda's request, Debtor wrote checks payable to Steve Lester from the Joint Account beginning around February 2016 to pay the purchase price installments.  Debtor, Oct. 15, 2019.  On one occasion, in December 2016, Debtor paid the Lesters' mortgage payment from Debtor's personal checking account at Bank of America.  Debtor, Oct. 15, 2019.  The final payment for the purchase of the Lake House of $500,000 was withdrawn from Linda's Ameriprise investment account on August 24, 2017.  Linda Hardin, Oct. 16, 2019; Exhibit Z17.

Following the purchase of the Lake House, Linda attempted to use the Lake House

as a short-term vacation rental, but she was unable to do so due to local government restrictions. Debtor, Oct. 15, 2019. Towards the end of 2018, Linda listed the Lake House for sale. Linda Hardin, Oct. 16, 2019. As of the time of the trial, the Lake House was under contract at a sale price of $900,000. Linda Hardin, Oct. 16, 2019. This contract is contingent upon getting permission to assign a dock permit from Linda to the buyers. Linda Hardin, Oct. 16, 2019.

In October 2016, Debtor had borrowed $500,000 against the Home, which he used to pay on a settlement, for his legal fees, his daughter's wedding, and other items, including payments on the Lake House and to purchase Linda's interest in Restorative Health. Debtor, Oct. 15, 2019; Exhibit Z215. In October 2017, Debtor transferred his interest in the Home to Linda. Debtor, Oct. 15, 2019; Exhibit Z62. According to Linda, the transfer was intended to equal and balance out their assets. Linda Hardin, Oct. 16, 2019.

Zurich initiated Case No. 16-02312 (the "Alter Ego Case") against Debtor in the GAND. Stipulations of Facts 1 (Doc. 112) ("SF 1"), ¶ 1. Debtor made an effort to settle the Alter Ego Case. Debtor, Oct. 17, 2019. The trial in the Alter Ego Case took place from June 4 to 8, 2018, before Judge Brown, at which time the jury heard the testimony of Daniel Klimek, Benjamin Foley, John Hardin, Professor Presser, and Robert Taylor. SF 1, ¶ 2. Judge Brown also admitted into evidence certain of Debtor's bank records. *Id*. Although Linda Hardin was subpoenaed, she did not testify or attend the trial. Linda

13

Hardin, Oct. 16. 2109.   On June 8, 2018, the jury entered a verdict in the Alter Ego Case, and Judge Brown entered a judgment on the jury verdict against Debtor and in favor of Zurich in the amount of $18,102,582 (the "Alter Ego Judgment"). SF 1, ¶¶ 4-5.   Zurich recorded the Alter Ego Judgment and obtained a Writ of Fieri Facias from the Superior Court of Gwinnett County, Georgia on July 6, 2018. SF 1, ¶ 6.   Zurich filed its *lis pendens* as to the Home on September 25, 2018.   Stipulations of Facts 4 (Doc. 115) ("SF 4"), ¶ 5. On July 18, 2018, Zurich filed its judgment lien certificate with the Florida Department of State as to Debtor.   SF 4, ¶ 4.

At the time of the entry of the Alter Ego Judgment, Linda knew that Debtor had lost the trial, but she did not know what the trial was about.   Linda Hardin, Oct. 16, 2019.   She learned about the judgment in July 2018 when she was advised to obtain her own attorney. Linda Hardin, Oct. 16, 2019.   Debtor had not previously talked to Linda about the verdict because he was afraid to confront her with it and had planned to appeal.   Debtor, Oct. 17, 2019.   Debtor "tried" to appeal the Alter Ego Judgment, but his attorney failed to file the appeal on time, and, on August 8, 2018, Judge Brown denied Debtor's request for additional time to appeal.   *Id*.   When Debtor learned that he could not appeal the Alter Ego Judgment, he was upset and surprised.   *Id*.

Debtor did not pay voluntarily any amount toward the Alter Ego Judgment.   Bo Gursky, Oct. 15, 2019.   While Zurich's litigation was pending against Debtor in the

14

summer of 2017, an attempt was made to sell the Home.   Debtor, Oct. 15, 2019.

On June 26, 2018, Linda wired $35,000 from the joint bank account of Debtor and Linda (the "Joint Account") to pay a debt secured by a Mercedes ML 350 vehicle owned by Debtor's married daughter, Taylor.   *Id*.; Linda Hardin, Oct. 16, 2019; Exhibit Z70.   Linda had been a co-obligor on the loan.   Linda Hardin, Oct. 16. 2019.   Although Debtor and Linda had discussed in March 2018 the fact that Linda wished to pay off the debt on the vehicle, Debtor was not aware that Linda had done so until post-judgment discovery. Debtor, Oct. 15, 2019.   Debtor was not surprised when he learned that Linda had paid off their daughter's car.   Debtor, Oct. 15, 2019.

On July 11, 2018, Debtor withdrew $83,544 from the Joint Account.   *Id*.; Exhibits Z70, Z71.   Debtor obtained three cashier's checks made out to his accountant and two attorneys.   Debtor, Oct. 15, 2019.   Debtor had retained Jones & Walden, his bankruptcy counsel, two days earlier and had given the firm $35,000 as an advanced retainer.   *Id*.

On July 13, 2018, Linda withdrew $47,500 from the Joint Account via certified check, but neither Debtor nor Linda knows or can remember what happened to these funds. *Id*.; Linda Hardin, Oct. 16, 2019; Exhibit Z70.

From April 2017 through April 2018, electronic transfers made from the Joint Account to Linda's sole checking account totaled approximately $532,722.   Debtor, Oct. 15, 2019; Exhibits Z69; Z70.   During the summer of 2018, Linda made new charges on her

creditor card for significant amounts at high-end clothing and electronic stores. Linda
Hardin, Oct. 16, 2019; Exhibit Z35. Similarly, Linda made approximately $15,000 of new
purchases on her credit card in November and December of 2018. Linda Hardin, Oct. 16,
2019; Exhibit Z35.

After obtaining the Alter Ego Judgment, Zurich engaged in extensive efforts to
garnish Debtor's wages and accounts and to attach Debtor's assets. Stipulation of Facts 2
(Doc. 113), ¶¶ 2, 3, 5, 7, 11-12, 15-16, 27-28, 31-32, 35-36, 39-41, 44, 47-48, 51-52, 55-56,
59-61, 64-67, 71-73, 77-79, 82-85; Debtor, Oct. 17, 2019. Specifically, from June 26,
2018, to September 20, 2018, Zurich moved for and obtained writs or summons of
continuing garnishment against SC Executive Group, RMU/Cohesive, EMG, Bank of
America, Merrill Lynch, PEO Resources, LLC, TD Ameritrade, Coconut Grove
Bankshares, Inc., The Hardin Group, Inc. (the "Hardin Group"), and Ameriprise Financial
Services, Inc. Stipulation of Facts 2 (Doc. 113), ¶¶ 2, 3, 5, 7, 11-12, 15-16, 27-28, 31-32,
35-36, 39-41, 44, 47-48, 51-52, 55-56, 59-61, 64-67, 71-73, 77-79, 82-85.

At this time, Debtor was a one-half owner of the Hardin Group. The Hardin Group
owned an office building, which it sold. Around the end of July or early August 2019,
Debtor received a check for $509,000 for his share of the sale proceeds. Debtor, Oct. 17,
2019. Debtor did not turnover to the check to Zurich, but rather kept it in a drawer. *Id*.
Debtor did not know what to do with the funds. *Id*. He was worried about the rights of

his other creditors and considered the possibility of using the funds to settle with CNA or using them to pay his legal fees.   Debtor, Oct. 15, 2019, Oct. 17, 2019.   On August 16, 2018, Zurich filed a motion for turnover order and relief in collection in post-judgment proceedings.   SF 9, ¶ 8.   A teleconference hearing on Zurich's motion for turnover order and relief in collection was held on August 17, 2018, in post-judgment proceedings.   SF 9, ¶ 9.   Judge Brown ordered Debtor to deposit the check into the court's registry.   Exhibit Z60.

In July 2018, Debtor met with a law firm, Jones and Walden ("J&W") and agreed to pay a retainer of $60,000 for services.   Debtor, Oct. 17; Exhibit D90.   Debtor believed that the retainer would not be sufficient, as he anticipated being sued again by Zurich. Debtor, Oct. 17, 2019.

On July 11, 2018, Zurich filed a complaint against Debtor and his wife, Linda Hardin, in the GAND (Case No. 18-03319).   SF 9, ¶ 10; Bo Gursky, Oct. 15, 2019; Exhibit Z73; Exhibit D93.   On October 1, 2018, Zurich sought leave to file its first amended complaint. SF 9, ¶ 11; Exhibit Z74.   Zurich alleged that transfers of real property and $600,000 in cash were avoidable transfers.   Bo Gursky, Oct. 15, 2019.   J&W represented Debtor in connection with this case and filed an answer on Debtor's behalf.   Debtor, Oct. 17, 2019; Exhibit D94.

On December 4, 2018, Debtor filed a voluntary bankruptcy petition under Chapter 7

17

of the Bankruptcy Code.   SF 9, ¶ 12.   Debtor paid J&W $10,000 for representation in connection with the filing of the Chapter 7 petition and $335 to be used to pay the filing fee. Debtor, Oct. 17, 2019; Exhibit D91.

Debtor made an effort to list all of his assets and liabilities.   Debtor, Oct. 17, 2019. Debtor listed an ownership interest in the $28,000 remaining of the retainer he paid to J&W.   *Id*.; Exhibit D105.   Debtor did not list as assets the Home, the Lake House, the Farmhouse, or an interest in any vehicle driven by his household members, other than the one Mercedes that he drives and owns jointly with Linda.   Debtor, Oct. 15, 2019. Debtor's household members drive an S Class Mercedes (Linda), two Mercedes GLK 350s (Debtor's son and daughter), and a Range Rover (Debtor's daughter) (the "Vehicles"). Debtor, Oct. 15, 2019.   Linda is the sole owner of the Vehicles.   Linda Hardin, Oct. 16, 2019.

The Trustee is investigating Debtor's financial affairs and the possibility of avoiding and recovering as fraudulent several transfers, including $600,000 of cash transfers from Debtor to Linda and Debtor's children, the Farmhouse, the Lakehouse, the Home, the interest in Restorative Health, and the payments made to pay off the vehicle owned by Debtor's daughter.   Trustee, Oct. 18, 2019.   The Trustee is also investigating the value of Debtor's scheduled assets, including interests in companies owned by Debtor that may own assets that can provide value to Debtor's estate, such as a $38,000 note receivable, a .178

18

acre-tract of land, and two lots in North Carolina.  *Id.*; Exhibit T2.  After the sale of real estate by EMG, $201,801 was delivered to the Trustee.  Proffer of Russell Patterson; Exhibit T1.  Debtor and EMG have been cooperative with the Trustee and responsive when the Trustee has requested documents.  Trustee, Oct. 18, 2019; Proffer of Russell Patterson.

On April 12, 2019, Zurich filed a proof of claim in Debtor's bankruptcy case in the total amount of $26,612,074, including both secured and unsecured amounts. SF 9, ¶ 13.[3] Other claims have been filed, including:  Claim Number 1, filed by American Express National Bank, in the amount of $25; Claim Number 2, filed by American Express National Bank, in the amount of $2,530; Claim Number 3, filed by CNA, in the amount of $35,695,080; Claim Number 7, filed by AWP, in the amount of $26,603,368; Claim Number 8, filed by Cohesive, in the amount of $4,849,200; and Claim Number 9, filed by the Ohio Department of Taxation, in the amount of $10,247, of which $7,297 is claimed as a priority, unsecured debt.

The deadline for filing objections to the Debtor's discharge or dischargeability of debt was March 11, 2019.  Doc. No. 4; Fed. R. Bankr. P. 4004; 4008.  On March 11, 2019, Zurich and AWP each filed complaints to determine the nondischargeability of the debts owed by Debtor.  *See* Doc. Nos. 78, 79; Adv. Pro. No. 19-5145; Adv. Pro. No.

---

[3] Claim Numbers 4, 5, and 6 were filed by the three Zurich entities, all in the amount of $26,612,074.

19-5150.   No party has objected to the entry of Debtor's discharge.

III. <u>Conclusions of Law and Discussion</u>

Under § 707(a), the Court may dismiss a Chapter 7 case only after notice and a hearing and only for "cause."   11 U.S.C. § 707(a).   Section 707(a) lists three, nonexclusive illustrations of cause, including unreasonable delay by the debtor that is prejudicial to creditors, nonpayment of any fees or charges required under chapter 123 of title 28, and, upon motion by the United States Trustee, failure of a debtor in a voluntary case to timely file the information required under § 521(a)(1).   The court may also dismiss a Chapter 7 case upon finding that the debtor filed the case was filed in bad faith.   *In re Piazza*, 719 F.3d 1253 (11th Cir. 2013).

Zurich asserts that, under the standard announced in *In re Piazza*, Debtor's case was filed in bad faith, as evidenced by Debtor's prepetition conduct, including Debtor's prepetition transfers of property to his wife and his excessive spending prior to and after the entry of Zurich's judgment.   In *Piazza*, the Eleventh Circuit held that "the power to dismiss a bankruptcy case 'for cause' in § 707(a) includes the power to involuntarily dismiss a Chapter 7 case based on prepetition bad faith." *Id*. at 1261. The court also held that, "a totality-of-the-circumstances approach is the correct legal standard for determining bad faith under § 707(a)." *Id*. at 1271.   This inquiry considers whether the debtor engaged in "atypical" conduct "that falls short of the 'honest and forthright invocation of

the Bankruptcy Code's protections.'" *Id*.   In short, the Court is to consider whether a

debtor's intentional acts or omissions "constitute a misuse or abuse of the provisions,

purpose, or spirit of the Bankruptcy Code."  *Id*. at 1272.   Among the purposes of the

Bankruptcy Code is "the equitable distribution of the debtor's assets amongst his creditors."

*Kuehner v. Irving Tr. Co.*, 299 U.S. 445, 451, 57 S. Ct. 298, 301, 81 L. Ed. 340 (1937).

This purpose is accomplished by several provisions within the Code, including the

automatic stay, which prevents creditor collection activity outside of the Bankruptcy Court,

and the preference avoidance provisions, which allow the avoidance and recovery of

property transferred in payment of legitimate debts immediately prior to the bankruptcy

filing to allow for the redistribution of the payments on a *pro rata* basis.  *See* 11 U.S.C.

§§ 362; 547.

        The totality-of-the-circumstances analysis and the factors considered in *Piazza* are

consistent with earlier Eleventh Circuit authority addressing bad faith in connection with

the filing of bankruptcy cases.  *See, e.g.*, *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393,

1394 (11th Cir. 1988) (when determining whether to dismiss a Chapter 11 as a bad faith

filing, "courts may consider any factors which evidence 'an intent to abuse the judicial

process and the purposes of the reorganization provisions' or, in particular, factors which

evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured

creditors to enforce their rights'"); *In re Dixie Broad., Inc.*, 871 F.2d 1023, 1027 (11th Cir.

1989) (noting that factors indicating a bad faith filing may include the timing of the filing of

the petition; a debtor that is not "financially distressed"; and a filing "strictly to circumvent

pending litigation or to reject an unprofitable contract" and upholding finding of bad faith

where evidence was clear that debtor filed bankruptcy "to get out of its bad deal"); *In re

Rivas*, 682 F. App'x 842, 845 (11th Cir. 2017) (stating that "broadly defined 'good faith'

means 'that the petition must be filed with the honest intent and genuine desire to utilize the

provisions of Chapter [13] for its intended purpose—to effectuate ... reorganization—and

not merely as a device to serve some sinister and unworthy purposes of the petitioner'" and

upholding dismissal where evidence showed the debtor filed a Chapter 13 case to obtain a

loan modification rather than to reorganize).

In *Piazza,* the court noted that the bankruptcy court, in its role as the trier of fact,

properly considered the framework adopted in *In re Baird*, 456 B.R. 112 (Bankr. M.D. Fla.

2010).   The *Baird* court listed the following factors as indicative of bad faith: (i) the debtor

reduced his creditors to a single creditor shortly before the petition date; (ii) the debtor

made no lifestyle adjustments or continued living a lavish lifestyle; (iii) the debtor filed the

case in response to a judgment, pending litigation, or collection action; (iv) there is an

intent to avoid a large, single debt; (v) the debtor made no effort to repay his debts; (vi) the

unfairness of the use of Chapter 7; (vii) the debtor has sufficient resources to pay his debts;

(viii) the debtor is paying debts of insiders; (ix) the schedules inflate expenses to disguise

financial well-being; (x) the debtor transferred assets; (xi) the debtor is over-utilizing the

protections of the Bankruptcy Code to the unconscionable detriment of creditors; (xii) the

debtor employed a deliberate and persistent pattern of evading a single major creditor;(xiii)

the debtor failed to make candid and full disclosure; (xiv) the debtor's debts are modest in

relation to his assets and income; and (xv) there are multiple bankruptcy filings or other

procedural "gymnastics."  *Id*. at 614-15.

Notably, and as Zurich acknowledges, the Eleventh Circuit Court Appeals did not

mandate the use of the *Baird* factors, holding only that the bankruptcy court did not commit

reversible error or apply an erroneous legal standard to conclude that the debtor had

exhibited bad faith.   It is clear from the court's holding in *Piazza* that this Court must apply

a totality-of-the-circumstances approach to evaluating whether this case should be

dismissed due to Debtor's conduct, but that the Court is not restricted to considering only

the *Baird* factors.  *Accord In re Uche*, 555 B.R. 57, 61 (Bankr. M.D. Fla. 2016)

(applauding "the Eleventh Circuit's rejection of the multifactor test and [agreeing] that

adhering to a list of factors to determine the existence of bad faith is problematic").   As the

bankruptcy court in *Uche* noted, an inquiry as to whether a Chapter 7 case was filed in bad

faith should focus on whether the debtor is pursuing a legitimate bankruptcy purpose,

which in the case of a Chapter 7 filing, is to discharge debts and preserve exempt property.

*Id*. at 62.   The court should also consider the fact that, "under some circumstances,

23

dismissal of a Chapter 7 case would only serve to favor some creditors over others."   *Id.*

Zurich argues that all of the *Baird* factors apply to Debtor's prepetition conduct and support the conclusion that the case should be dismissed.   Specifically, Zurich argues that: (1) Debtor made no adjustments to his lavish lifestyle, as he continues to reside in the Home and to have access to the Lakehouse and the Farm; (2) Debtor filed this case in response to Zurich's obtaining the Alter Ego Judgment and Zurich's collection attempts, including Zurich's attempts to avoid Debtor's transfers of the Home, the Lakehouse, and the Farm to his wife; (3) Debtor filed this bankruptcy case in an attempt to avoid his largest debt; (4) before filing this bankruptcy case, Debtor transferred virtually all of his assets to third parties, so that very little remains in Debtor's name, including the Home, transferred on October 11, 2017; significant amounts of cash, transferred before and after the Alter Ego Trial began and in some cases, after judgment and after Zurich moved for garnishment, but before the garnishment was ordered by the District Court; the funds necessary for Linda Hardin to purchase the Lakehouse, as checks were written from September 2016 through December 2016;   the Farm House, transferred in December 2011, at a time when Debtor was ending PMSG's insurance program with Zurich; funds necessary for Linda Hardin to acquire an interest in Restorative Health, as Debtor paid for the interest from June 2016 through January 2017, but the interest was placed Linda Hardin's name; funds fraudulently transferred by Debtor to his attorneys (Jones & Walden), as Debtor gave $35,000 to Jones

& Walden on July 11, 2018, as a deposit for work to be performed in the future and transferred an additional $63,000 in the following weeks; (5) Debtor has made no efforts to repay his debts, as evidenced by his wrongfully holding a $509,000 check received from the sale of an office building in his desk drawer until compelled to release the check through a temporary restraining order entered by Judge Brown; (6) Debtor paid the debts of insiders, including a loan Linda Hardin took out for a Mercedes automobile (driven by Debtor's daughter) and paying down the mortgage on the Home that is owned solely by Linda Hardin; (7) Debtor has employed a consistent pattern of evading Zurich's collections efforts, starting with the use of PMSG as his alter ego, transferring and "siphoning" assets from PMSG, and using PMSG's funds to pay his personal expenses to prevent Zurich from being paid;   and (8)  it would be unfair to allow Debtor to use bankruptcy when he has come to this Court in bad faith and by dishonestly representing and concealing his assets.

Debtor asserts that his conduct does not rise to the level that warrants a finding of prepetition bad faith, as he has come to the Court in good faith, making an honest effort to surrender his assets for liquidation and to disclose his financial affairs, and has cooperated fully with the Trustee.  Specifically, Debtor claims that he filed this case in an effort to bring all of his creditors into one forum, which is consistent with the fundamental purpose of bankruptcy; he did nothing wrong with regard to Zurich, rather Zurich's claim is the result of contract dispute and Zurich's allegation that Debtor was the alter ego of PMSG; he

began the process of exiting the PEO business in 2010, long before there was any issue with
Zurich, and Zurich knew that Debtor was doing so; and he finalized the sale of his interest
in the business to his brother, John Hardin, in December 2013.   In Debtor's view, Zurich
has failed to establish cause to dismiss the case under § 707(a), which would essentially
deprive Debtor of access to bankruptcy relief.   Further, Debtor argues that he has not
misused or abused the provisions or spirit of the Bankruptcy Code, but rather has sought an
orderly liquidation of assets and this Chapter 7 case will benefit creditors.   As to Zurich's
allegations that he engaged in prepetition, bad faith conduct, Debtor asserts that the Home
is not lavish and points out that Debtor was prevented by the existence of Zurich's *lis
pendens* from downsizing; Debtor could have filed a Chapter 11 case to preserve his assets,
rather than filing a Chapter 7 case with the full intention of surrendering his assets to be
liquidated; Debtor did not file this bankruptcy case solely because of Zurich, as he was
facing multiple pieces of litigation and millions of dollars of debt, including litigation
brought by APW and CNA;   and Debtor did not fraudulently pay his attorneys and attempt
to hide the fact, as he needed representation in the face of multiple claims in very high
stakes litigation and he produced voluminous documents and authorized financial
institutions to provide records in an attempt to comply as best he could with Zurich's
extensive post judgment requests.   Finally, Debtor notes that, since the filing, he has
cooperated with the Trustee by providing documents informally requested so that the

Trustee will obtain a better understanding of Debtor's assets and the ability to recover on the same.  Debtor admits there were transfers of property, but he is prepared to defend those transfers and, even if the transfers were fraudulent, the existence of fraudulent transfers is not a reason to dismiss a Chapter 7 case in which a Chapter 7 trustee stands ready to pursue avoidance of the transfers.

Trustee, the Creditors, and the United States Trustee submit that this is not a two-party dispute between Zurich and Debtor.  Debtor has additional creditors and there are assets for the Trustee to liquidate.  Not allowing the Trustee to administer this case would be unfairly prejudicial to Debtor's other creditors.

The Trustee points to the fact that Debtor's schedules identify numerous creditors, holding substantial debts.  The Trustee further notes that she has already acquired over $201,000 in funds on behalf of the bankruptcy estate from the sale of real estate owned by EMG and that there are other assets and avoidance actions that the Trustee intends to liquidate and pursue for the benefit of all creditors.   Therefore, the Trustee urges the Court to exercise its considerable discretion to not dismiss this case in recognition of the notion that, under the Bankruptcy Code, the equitable treatment of creditors is of paramount concern.  The Trustee distinguishes the facts of this case from those in *Piazza* because, in *Piazza*, the creditor's motion to dismiss was opposed only by the debtor and not by the trustee and, therefore, the bankruptcy court considered how dismissal would affect the

27

debtor, rather than the fairness of dismissal to other creditors.   Finally, the Trustee urges the Court to consider the fact that Debtor has cooperated with the Trustee post-petition and did not attempt to "hide" the EMG sale that resulted in Trustee's current recovery of in excess of $201,000.

The Creditors echo the Trustee's arguments in favor of allowing the case to continue, noting that Debtor has many creditors other than Zurich, which hold substantial claims and have filed proofs of claim.   The Creditors urge the Court to consider the fact that the dismissal of the case would prejudice to these creditors and result in a race to the courthouse, leading to potentially inconsistent and inequitable results.

Having carefully considered the parties' arguments and the record evidence presented at the Evidentiary Hearing, as well as applicable caselaw, the Court agrees with Debtor, the Trustee, the Creditors, and the United States Trustee.   Based upon the totality of the circumstances, dismissal of this case is not warranted.

The Court agrees with Zurich that Debtor filed this case in immediate response to Zurich's obtaining the Alter Ego Judgment and initiating collection actions.   However, the evidence does not support the conclusion that Debtor had no other purpose in filing the case or that he somehow believed he could prevent the avoidance of the fraudulent transfers Zurich would have pursued in the absence of bankruptcy.   Debtor was being sued by other creditors, who are now asserting massive claims in this case.   Debtor had need of

bankruptcy relief sufficient to explain his decision to throw himself "on the mercy of the bankruptcy court." *Uche*, 555 B.R. at 62.   He clearly understood that the Trustee would succeed to his creditors' rights to avoid fraudulent transfers.   Nonetheless, he did not choose to file a Chapter 11 case, in which he could attempt to retain control over the prosecution of any avoidance actions and further delay his creditors' abilities to exercise their rights.   Rather, he chose to file a Chapter 7 case, surrendered what he had left and cooperated with the Trustee.

That being said, the evidence does bear out Zurich's complaint that Debtor, over a period of time, transferred substantially all of his assets to third parties, leaving him with few assets, relatively speaking, to surrender.   But the evidence does not support the conclusion that Debtor began, as early as 2010, to position himself to achieve that result. First, Debtor gave some assets to Linda early in their marriage, which is not unusual when one spouse works outside the home and the other is a "homemaker."   For example, Debtor put one half of the Farmhouse in Linda's name when it was purchased in 2003, at a time when there is no suggestion or evidence that Debtor's businesses were doing anything but flourishing.   The Court also believes that Debtor and Linda intended to own jointly the Home at the time it was purchased, but through an error, the Home was titled only in Debtor's name.

Second, the Court credits the testimony of Debtor and Linda that Debtor wanted to

exit the PEO business to spend time coaching soccer and that he began dividing his assets for legitimate estate planning reasons around 2010.   The evidence did not demonstrate that Debtor knew he was in financial trouble or that he expected to be in financial trouble when he transferred stocks and cash to Linda in August 2011 or his one-half interest in the Farmhouse to Linda in December 2011.   In fact, Debtor testified that adjustments to the Zurich policies were routine and usually did not result in an amount owed by his companies.   While the evidence does show that Debtor paid for approximately $300,000 of the Lakehouse, which was titled in Linda's name, at a time when Debtor had reason to believe that he had "exposure" for the Zurich debt, $500,000 of the sales price came from Linda's stock account, which had been transferred to her before the litigation with Zurich began.   While Zurich attacks the legitimacy of Debtor's estate planning because it left Linda with everything and Debtor with nothing, Zurich overlooks the fact that Debtor kept his businesses, which were worth millions of dollars at that time.   As Debtor's counsel pointed out, after the assets were divided, Debtor lost much of his wealth through bad business decisions and spent much of it on litigation, while Linda has generated income from the assets she received.   For example, Linda received rental income from the Farmhouse in 2017 and 2018.

The Court also discounts Zurich's contentions that Debtor has never made an effort to pay or resolve his debts to Zurich.   One must keep in mind the fact that, until the entry of

the Alter Ego Judgment, Debtor was not personally liable for the bulk of his debt to Zurich, so could not necessarily have been expected to use his personal funds to pay that debt. Nonetheless, the evidence shows that Debtor, through the PEOs, attempted to resolve the issue through arbitration and through the Standstill Agreement, at which time the PEOS paid $4,694,735 plus interest.   He also worked to settle one matter of litigation that was filed against him by Zurich and made a partial payment on a portion of his liability to Zurich.   Debtor also testified that he attempted to settle the Alter Ego Case.

Zurich's point is well taken that, leading up to the entry of the Alter Ego Judgment, Debtor made significant transfers, paid debts of insiders, and did not stop Linda from spending what she considered to be her money.   For example, Debtor paid for Linda's purchase of an interest in Restorative Health, transferred his interest in the Home to Linda, allowed Linda to pay off their daughter's car (although Linda was co-liable for the debt), and paid for at least a portion of Linda's purchase of the Lakehouse.   But, as the Trustee points out, if these transfers were fraudulent, the Trustee has a remedy in the form of an avoidance action, and that remedy would benefit all creditors.

In fact, the Trustee reports that she is investigating Debtor's financial affairs and the possibility of avoiding and recovering as fraudulent several transfers, including $600,000 of cash transfers from Debtor to Linda and Debtor's children, the Farmhouse, the Lakehouse, the Home, the interest in Restorative Health, and the payments made to pay off

31

the car loan, and has additional assets to liquidate, including a $38,000 note receivable, a

.178 acre-tract of land, and two lots in North Carolina.   Unlike many Chapter 7 trustees,

the Trustee already has funds on hand to assist in this process, as she received $201,801

from the sale of real estate owned by an entity in which Debtor had an interest.   There is

reason to allow her to do so, given the filing of proofs of claim that total over $67 million.

While there is certainly evidence that Debtor made transfers to Linda and spent

money on items other than debt repayment, there is also sufficient evidence to establish

that, in filing the bankruptcy case, Debtor is pursuing a legitimate bankruptcy purpose and,

since filing the case, has acted in good faith, fully disclosed his assets and financial affairs,

and cooperated with the Trustee.   As to any prejudice to Zurich, Zurich retains the right to

seek a determination that its debt is nondischargeable due to Debtor's prepetition conduct

in connection with the creation of the debt and will benefit from any recoveries by the

Trustee.   Further, the benefit to all other creditors of having this case continue weighs

heavily in favor of permitting the Trustee to administer the case.   For that reason, the Court

exercises its discretion to allow the case to continue.

Accordingly,

IT IS ORDERED that the Motion is DENIED for the reasons stated above.

**END OF DOCUMENT**

32

**Distribution List**

**All parties on the Court's Mailing Matrix**